And we'll turn to the next case on our calendar, United States of America v. Marcos Alonso Serra, also known as Ali Serra. Mr. Wilson. Good morning. You've extended the scope of your domain. I have, Your Honor. I'm here from the Federal Defender's Office. I was initially appointed in this case as a member of the CJA panel from the Second Circuit, and I was able to bring the case with me. This case presents two issues that come out of the guilty plea and the sentencing of Mr. Zea, which is a challenge to his plea and a challenge to his sentence. Now I understand, standing here, as I'm sure Judge Boulier will recall, that the first hurdle is going to be United States v. Petit. And how does this case react to that or overcome the discussions that are in that? And I reference Judge Boulier because I argued that case when he was on the panel. How did that turn out? Well, it had its positives and its negatives. On the positive standpoint, I'll say that the court reminded everyone that Rule 11 is to be followed. There's a requirement of strict adherence. So if a district judge deviates from it, really in any extent, then we're entitled to scrutinize what's the impact of that. And here we have a record that indicates that there were deviations, important ones. One was a failure to advise Mr. Zea of his right to have counsel throughout every stage of the proceeding, including appointed counsel. In addition, while the judge did say he'd have an opportunity to present evidence at a trial, the judge was not specific to point out that he would have a right to testify, the right to compel the attendance of witnesses. The government tries to say that's not a big deal because the judge mentioned the right to present evidence, but Rule 11 doesn't say tell the defendant he has the right to present evidence. It says both of those things specifically. Now, why does that matter? Now, one of the things I don't like about the Petit case, frankly, is that it suggests that almost any number of rules that are broken are fine unless the defendant at some point stands up and makes an objection or potentially a motion in which a guilty plea comes that maybe presses those issues at that time. And frankly, that's just not going to happen very often in the district courts. But here it didn't happen. But we have a couple of things that we can look at as to the issues of whether his substantial rights were affected, and then ultimately the questions about whether there's the integrity of the process is being subjected to. One of the questions, and this isn't the first time in this sitting that this issue has arisen, is who bears the responsibility on the part of the parties to ensure that Rule 11 is complied with? At the time of the change of the plea? No, at the time of the change of the plea when Rule 11 is explained. One of the things I took exception to in the Petit decision is that Judge Lynch's opinion seems to be saying that it's my job and the prosecutor's job to make sure Rule 11 is followed to some extent. The rule says that it's the court that is supposed to have the colloquy with the defendant. So I view the rule as telling us that it's the judge's job in that situation. Well, but the loss on that is to us, and I want you to continue to answer Judge Walker's question. The loss on that is that the government can ask a question or say something, and then the district court can fulfill its obligations under Rule 11 by saying, do you understand what the government just said? Is that correct? I agree. It doesn't have to happen perfectly. And if the judge misses something, the prosecutor could certainly say, Your Honor, you might want to remind him of his right to compel witnesses at a trial. I've certainly been at a lot of sentencings. It happens far more often there where at the end of it the government will say, well, Judge, did you ask him about this? Do we want to make sure he understands that and reviews a number of factors? We don't seem to do that during plea colloquies. Now, as a defense counsel, sometimes I just want to get out of the room, quite frankly, and have the plea entered. And also as a defense counsel, I'm not always looking to take away the potholes. Sometimes I want to leave some there. But the government certainly has the opportunity. I don't think it would be objectionable if they said, you know, Judge, you missed 11D and 11F. So I think especially when they want to enforce plea waivers and collateral attack waivers later on, it would certainly be in their interest to bring it up. But to get to your question, I think really it's the judge's responsibility first and foremost. The government certainly has an interest in making sure that the rule is followed. In defense counsel, I would want to stick to my obligations of candor and certainly wouldn't want to deviate anything. But I didn't like the idea that it's my job to make sure that each and every rule is followed. Really the plain reading of the rule is that it's the judge's job. Mr. Wilson, if you prevail here, what are the possibilities on remand? What is it that would happen in your view? Well, there's two arguments here. If I prevail on the plea problems, then you would vacate the pleas. It would go back, and it would pick up, you know, T minus one. Yes, and what are the government's options at that point? That is, what would be the risk or the exposure? What would be the exposure of your client at that point? The zero to 25-year parameter that's in the plea agreement would be off the table. That's obviously the biggest exposure. And what would be the maximum possible sentence on remand if you prevail? So it wouldn't be life. I think at that point the maximum— But it would be substantially more than the sentence actually imposed by Judge Feust. It could get up to 35 years, just on the counts that were pledged to you. I have to say I'm not sure whether they would be allowed to resurrect the other counts because he only pled guilty to counts three and four. Now, you were not counsel. Were you physically present? Were you counsel? No, I'm Connecticut. I thought so. That's why I knew that you had probably gotten into this as a member of the CJA panel, which we very much appreciate. And I had also noted that you had changed your hat now with the Federal Public Defender. So let me ask you, have you discussed with your client what the possible risks are of your achieving a full victory here? I don't know if I can address that fully, Your Honor. Try. Give it a try. Because of the privilege issues. I don't want to know the details of any— All I want to know is whether he's aware that if he prevails here and the government then pursues this indictment and he is convicted after trial, he may get a sentence which is substantially longer than the one he already has. That's all I want to know. Does he know that? I think he's aware that there are risks. I can put it that way. Now— But have you— Go ahead. I don't want to put you on the spot, but because you have predecessor counsel, maybe you can tell us about predecessor counsel, but have you personally had any kind of conversation on this? I don't want to know the substance of the conversation. I just want to know whether you've had the conversation. I've had communications with Mr. Zia while he's been in custody. In writing? Some through writing, some on the phone. I think some through the email system, but I— Were you able to discuss this risk, this possibility? With all my clients, when I raise these questions— No, no, I don't care about all your clients. I want to know about this client. Your Honor, in all candor, I'm not sure if I'm allowed to answer that question. You've got an attorney-client privilege you're concerned about. That's my concern. I'm not trying to not answer your question, but I'm trying to protect Mr. Zia's privilege. You can tell us that you've had a communication. You just can't tell us what the nature of that communication is. I certainly could say yes to that. Well, why don't we—I mean, I'm just thinking aloud with you. Perhaps you can be helpful. Why, in these circumstances, shouldn't we give you and your client 30 days in which to reflect further on this matter? And without telling us anything about your communication, you then can let us know in a letter. I'm just suggesting this. whether at that point your client wishes to pursue this appeal or withdraw the appeal, or whether he would like to have it submitted formally for decision based on the record which will exist as of that time. Your Honor— We've done this on a number of occasions, and it's been very fruitful. Your Honor, if that's what I'm ordered to do, I certainly will send him a letter that will recap this discussion and the concerns that you seem to be suggesting, and I can file something 30 days, 45 days, however you want to set the schedule with my right hand. Okay. So we may not do this. I'm just sort of suggesting whether we might. That's fine, and I'll keep an eye out for a ruling in that regard. I know I've burned through my time. I think one of the reasons—and I'm going to cut to the other issue at this point. One of the reasons why I'm less concerned about the risk is because if the sentencing is handled properly, even if this case were to go back and kind of start over again, if the sentencing were handled properly, I'm confident that Mr. Zayas certainly wouldn't do any worse than he did the first time around. For whatever reason, his defense counsel chose to go out and look at press releases from the Department of Justice and make comparisons based on those, which isn't a bad starting point just to sort of get a sense of things, but ultimately he did not present an adequate record for the judge to rely on. Now, does that excuse the judge from doing a comparative analysis? My point here today is that it doesn't. She still needed to engage in that same comparative analysis, even if it meant stopping the sentencing and saying, come back here with some real stuff for me to look at, because she has to consider all the factors under 3553A. What's to make us think, based on this record, that she did not do any comparative analysis? You're saying that there's got to be some substantive, complex comparator analysis. I haven't seen that requirement. I think in terrorism cases where we have such extreme jumps in the guideline ranges, where we have such varieties of activities amongst people, the cases that I cite to discuss this, there needs to be that individual comparison. And one of the things I'm concerned about, frankly, in reading the record. Well, if that's true, then you'd also have the same in securities fraud cases, extreme jumps and complexities, differences, and so on, and where does it end? Your Honor, maybe they've got a point there, too, when it comes to the fraud cases. I don't tend to get a lot of securities fraud cases as a public defender. Lucky you. I'm sorry? Lucky you. Hearing that first argument today reminded me of that. But the point being that whether he was overmatched, I don't know. One of the things that struck me in the record, though, is that the government didn't seem to chide – excuse me, the court did not seem to chide the government, but it made general references to the Boston bomber or to another case that I think is fairly well known in the Eastern District about the Long Island Railroad and that guy. The court did not turn to him and say, look, I need to see some briefing or some records or something to support what you're saying. He got a very different response from the judge, which essentially is, I'm going to give you the sentence because it reflects, sadly, the times in which we live. If you prevail here, will you remain as his counsel in the Eastern District proceedings? If there are any further proceedings? I think there's a mechanism by which that can be done. I personally am not a member of the bar in the Eastern District. My understanding is that – They're very welcoming. That may be. They have all the airports. I like the train. And the Federal Defender's Office, I think, would be conflicted out, the local one, based on their having been involved in representing Mr. Khalid. Which would suggest even more that you should participate. In our office, I made reference to it, our office handled a somewhat similar type case, presenting this grand matrix of all these other cases to consider, both as to how they were resolved, what the conduct was that was involved, and what the sentences were. That's not a basis for recusal. No, that's a reason why I think we would do a good job. Okay. You have some more time you're reserving. Thank you. Let's hear from Mr. Kendi. Who's been thinking about checklists. I know. Good morning, Your Honors. I may have pleased the Court. My name is Michael Kendi, and I'm an Assistant United States Attorney in the Eastern District of New York, and I respectfully submit that the judgment of the District Court should be affirmed. To the extent that Rule 11 was not strictly adhered to, the defendant's plea allocution should be upheld as it substantially satisfied the requirements. Were you the AUSA on this case from the beginning? Your Honor, I was assigned to this case with two of my colleagues. I was not present when the plea was taken. So what is the problem with having a checklist of the government and just going through this so we don't have these problems come up? Is it going to take a reversal to kind of wake up the U.S. Attorney's offices, that they have sort of a responsibility to make sure that the strictures of Rule 11 are complied with? Your Honor, there is a checklist. I use a checklist when taking pleas. I can't speak definitively as to whether or not a checklist was used here. The office does have one, and our assistants are instructed to use that when taking pleas. So why are there these constant chronic mistakes? That's a very good question, Your Honor. If there's not strict adherence to using the checklist, obviously you're going to have these problems. Oftentimes when you have a checklist, I think assistants need to understand, certainly the court needs to understand, that the rule needs to be strictly adhered to. So, for example, here where you have the court saying, you'll have the right to cross-examine the government's witnesses, you'll have the right to challenge their evidence, and you'll have the right to present your own evidence. There may be a mistaken belief at that point that that has fulfilled the requirements that they have the right to call witnesses and compel those witnesses. The rule specifically states that you have the right to compel witnesses. So better instruction certainly could be done to ensure that the rule is followed. Additionally, for example, if you need support in conveying the message to your office that the checklist approach and the care with which these proceedings are accomplished is reconsidered important, please take that message back. I certainly will, and it's my understanding there was a similar argument yesterday for Your Honors, and I spoke to my colleague, and certainly will convey this also to the chief judge of the district to ensure that it's properly followed. Yeah, I'm glad you mentioned that. You might mention it to Chief Judge Elisagri, not you perhaps, perhaps Mr. Capers, in the kind of informal conversations that are inevitable regarding the administration of the courthouse and the caseload. I think we would all welcome that conversation with her, not because the Justice Department can give judges any instruction, but merely that you have a common interest in these checklists and that it's important that the judges also have their checklist. And your job, I think, I speak for my colleagues when I say that when you see that the judge has missed one or another item, I think we think it's your responsibility to say in a respectful way that, Your Honor, there's something we haven't quite done that perhaps we should consider. I certainly agree, Your Honor, and to the question that was posed before, whose responsibility is it? I think the follow-up question is, who bears the consequences? And here, if there's a mistake and the rule is not strictly adhered to and it reaches the point where the case is remanded, that responsibility is, the consequences fall on the people of the United States that believe that the police should have been appropriate. So certainly, I'm mindful of that and I will convey that message back. However, here, the question becomes whether or not we've reached that level where there was. . . There's no doubt here that there was error. That's correct, Your Honor. Certainly, with the three specific areas, the question becomes whether or not substantially affected the fairness, integrity, and public reputation of those judicial proceedings. And I respectfully submit that it did not. Furthermore, the petitioner, the defendant here, cannot show that there was a reasonable probability that but forced those errors, he would not have entered his plea. And I state that because of the evidence here. The evidence here was overwhelming against the defendant. So much so that there were lengthy plea negotiations by his counsel, Mr. Bogatin, to ensure that he minimized the exposure his client faced. The question was asked, what's the maximum sentence? There were three counts that carried a maximum sentence of 15 years apiece and two that carried a maximum sentence of 20 years apiece. So certainly, at trial, this defendant faced a tremendous amount of exposure. This was a carefully negotiated plea and it was asked for and negotiated based on the strength of the evidence. The evidence in this case involved individuals from border security in England where the defendant attempted to travel to Yemen and he was turned around. Forensics. I'm sorry? Forensics examiners and so on. Correct. It was also recorded. There was an undercover New York City Police Department intel detective that was used in this case who recorded the defendant, recordings of the defendant engaging in operational security where he would tell his co-conspirators, remove the batteries from your cell phones so we can discuss. Let me ask you about the sentencing. Yes, Your Honor. So there's apparently someone named Shannon Conley who was proposed as a comparator who received a sentence of 48 months. Can you explain that to me? I don't know the specifics of the Conley case. What I do know is that the court, when the question of sentencing disparities came up, clearly stated that it considered all the written submissions. Those written submissions included the comparative cases that the defense counsel had submitted. She also considered all of the specific press releases that the defendant submitted. The fact that the court rejected those doesn't mean that she didn't consider them. Certainly, she specifically stated, I've considered all the 35 and 38 factors. I've read all of the written submissions. I've listened to all of the oral arguments. And she specifically cited some 35, 53, 38 factors that weighed especially on her in considering what an appropriate sentence was. Moreover, she also considered the sentencing guidelines. Here, the negotiated- Although some of those, the reason I want to focus a little bit on Conley is that several of those factors seem to also exist with respect to Conley's case. A homegrown terrorist tries to get to the Middle East, Yemen, or Syria, and is turned back. Well, again, I don't know the specifics of that case, but one of the aggravating factors here is the fact that the defendant not only tried to travel over to Yemen to join al-Qaeda in the Arabian Peninsula, he engaged in additional condom. The fact that he was turned around at the border and came back did not serve as any deterrent to this defendant. In fact, it only empowered him to convince his co-conspirator that he should, in fact, travel. And he engaged in a prolonged series of acts that showed that he was undeterred, that his radicalization would not stop merely because he was turned around. Not only did he provide moral support, he provided planning to his co-conspirator, and also money. When he knew that the FBI was enclosing in on him, he engaged in other aggravating factors, including destroying evidence of his crimes, specifically his two hard drives. So, again, I don't know the specifics of that case, but this wasn't merely an individual that went on the Internet, decided it would be a good idea to try to travel to Yemen, and was turned around, saw the error of his ways, and went about living a law-abiding life. The complete opposite here. You're suggesting that tourism in Yemen is not a major industry. Certainly not at the time. Or now. Or now. In fact, the defendant bragged to the undercover officer how he lied to the border agent as to his intentions. Furthermore, what's especially chilling is when his co-conspirator, Mr. Kleebe, attempted to travel, he said, I hope that my experience will inspire you. So, for example, I had trouble. I hope that the troubles that I've had being turned around will help you in your ultimate goal in traveling over to Yemen to fight on behalf of al Qaeda in the Arabian Peninsula. So there are distinguishing factors there. And certainly I don't think the 25-year sentence shocks the conscience. I think that when we look at terrorism cases especially, and the fact that these individuals are radicalized, are often very difficult to rehabilitate, or specific deterrence is necessary. In fact, the defendant made no mention at his sentence of any sort of remorse at all to show that a 25-year sentence would be enough. What do we know about Mr. Wilson's predecessor counsel, who was present at the plea? What I know about Mr. Bogatin is that he engaged quite vigorously with the government, myself included. Did he raise objections to the failure to – did he raise any questions about these three items in the putative checklist? No, the record does not indicate at all that – No questions. No. So we're left with a situation where, I suppose, out of the goodness of Mr. Wilson's heart, he has not suggested an effectiveness of counsel. So has he been advised of the fact that his effectiveness is in fact at issue here? I can't speak to that, Your Honor. The government has not advised him of the proceedings. We have case law, at least two cases, in which we made clear that when a lawyer's performance in the district court is at issue on appeal, that a counselor required to bring it to that lawyer's attention, who, of course, has a significant reputational interest at stake. It's most obvious, of course, when there's a direct charge of ineffectiveness, but I just raise it for your general information. Let's hear from Mr. Wilson, who is reserving time. Thank you, Your Honor. Thank you. Just a couple of glib responses and then one more substantive one. The first glib one is that there's nothing like a reversal to wake up the United States Attorney's Office and the bench in terms of how processes should be handled. I think Judge Lynch, frankly, was trying very hard in fatigue to say, come on, let's do this right and give a lot of guidance. But ultimately, if you want real change, there has to be a more definitive signal. There was a statement, I think, by the government about kind of who bears the consequences when there was an error. Well, ultimately, it's the defendants that are bearing the consequences, if they're not the ones that are advised of what the rights were. That's true, certainly, if the error is not. The last point really is the weighing of the evidence. You did the usual prosecutor's present summation of the evidence, but I've got two points. One is in Petit, it's a different type of case. It's a child pornography case where they do a search. The search finds all sorts of stuff on the computer. It's like any kind of possession case, like possession of a firearm. Usually you win and you lose at the suppression hearing. And if he lost and the case is over, because you go to trial, it's going to take five minutes, although I'm sure the government would stretch it out for a week. This case is different than that. This is not a possession case. Granted, there's some recordings, but there's two undercover agents that are working the case, that are having these communications. There's another person, a Mr. Khalid, who my understanding is now presenting evidence in his sentencing that he may have Asperger's or some sort of autism, which gives rise to other theories that can be presented in a defense about whether the undercovers were able to manipulate him. But everything was corroborated by the forensic evidence that was found in the hard drives that your client tried to destroy. I think the obstruction charge is tougher. I'm not going to say that that's an easy one. But in terms of what the ultimate goals were, how this was all going to turn out, I'm not saying the government wouldn't win a trial, but there's a much bigger mess to be made. And because of that, the ease of which to say that the integrity of the process or the substantial rights have not been harmed, it's harder. It's harder than Petit. This is a more challenging case to uphold. So unless the court has any questions, I'll rest on my greaves. Thanks very much, Mr. Olson. We'll reserve the session.